IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LUTRON ELECTRONICS CO., INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. _____ |
| v. | § | |
| | § | |
| LEGRAND NORTH AMERICA, LLC, | § | **JURY TRIAL DEMANDED** |
| d/b/a LEGRAND, PASS & SEYMOUR, | § | |
| INC., THE WATT STOPPER, INC., and | § | |
| CURRENT PRODUCTS CORP., f/k/a | § | |
| QMOTION INC., | § | |
| | § | |
| Defendants. | | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Lutron Electronics Co., Inc. ("Lutron") files this Complaint against Legrand North America, LLC, d/b/a Legrand, Pass & Seymour, Inc. ("Pass & Seymour"), The Watt Stopper, Inc. ("WattStopper"), and Current Products Corp., f/k/a QMotion Inc. ("QMotion") (all four collectively, "LEGRAND" or "Defendants"), alleging, based on its own knowledge as to itself and its own actions and based on information and belief as to all other matters, infringement of U.S. Patent No. 8,242,714 (the "'714 patent"), U.S. Patent No. 8,704,459 (the "'459 patent"), U.S. Patent No. 6,803,728 (the "'728 patent"), U.S. Patent No. 7,663,325 (the "'325 patent"), U.S. Patent No. 9,024,800 (the "'800 patent"), and U.S. Patent No. 9,361,790 (the "'790 patent") (collectively, the "Asserted Patents"), attached as Exhibits A-F, as follows:

## PARTIES

1.      Lutron is a Pennsylvania corporation with its principal place of business located at 7200 Suter Road, Coopersburg, Pennsylvania 18036.

2.     Legrand North America, LLC, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 60 Woodlawn Street, West Hartford, Connecticut 06110. Legrand may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

3.     Pass & Seymour is a New York corporation with its principal place of business at 50 Boyd Avenue, Syracuse, New York 13221. It is an affiliated company of Legrand. Pass & Seymour may be served through its registered agent, C T Corporation System, 111 Eighth Ave., New York, New York 10011.

4.     WattStopper is a California corporation with its principal place of business at 2700 Zanker Rd., San Jose, California 95134. It is an affiliated company of Legrand. WattStopper may be served through its registered agent, C T Corporation System, 818 W. 7th St., Suite 930, Los Angeles, California 90017.

5.     QMotion is a Florida corporation with its principal place of business at 1995 Hollywood Ave., Pensacola, Florida 32505. It is an affiliated company of Legrand. QMotion may be served through its registered agent, Bette Denniston, Current Products Corp., 1995 Hollywood Ave., Pensacola, Florida 32505.

<u>**JURISDICTION AND VENUE**</u>

6.     This action arises under the Patent Act, 35 U.S.C. § 1 *et seq*.

7.     Subject matter jurisdiction is proper in this Court under at least 28 U.S.C. §§ 1331 and 1338.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1400(b).

9.     Defendants have a regular and established place of business in this District, including by virtue of the Legrand headquarters in West Hartford.

10.     Defendants have transacted business in this District and have committed, by themselves or in concert with one another and others, acts of direct and indirect patent infringement in this District.

11.     Pass & Seymour, WattStopper, and QMotion work together with Legrand as a single enterprise, with Pass & Seymour, WattStopper, and QMotion acting as agents for Legrand and vice versa. For example, WattStopper, Pass & Seymour, and QMotion are presented as "product lines" on the www.legrand.us website. When the user selects "Where to Buy" from the WattStopper webpage within that Legrand website, the interactive website takes the user to the same "Where to Buy" webpage as when the user selects "Where to Buy" from the main Legrand webpage or the Pass & Seymour webpage within the Legrand website.

12.     In addition, the Legrand website lists Pass & Seymour® as one of the "trademarks of Legrand in the United States." And on the "patents" webpage within the Legrand website, www.legrand.us/aboutus/legrand/patents.aspx, the heading for all listed patents is "Pass & Seymour Patents." And while adorne® is branded as a legrand® product on at least Legrand product installation sheets, patents under the "adorne™" heading are assigned to Pass & Seymour in the PTO database.

13.     By way of further example, in its December 18, 2015 press release announcing that Legrand had acquired QMotion, QMotion explained that it would "become part of Legrand's North American Building Control Systems (BCS) business." That same press release confirmed that Legrand's product lines included Pass & Seymour and Watt Stopper. In its most recent press release, dated June 19, 2017, QMotion refers to itself as "a brand of Legrand."

14.     Defendants sell and/or induce use of infringing products in this District through numerous retailers such as Lowes and Home Depot; manufacturers' representative ESS Lighting and ESS Electrical Systems Solutions, 60 Woodlawn Street, West Hartford, Connecticut; electrical distributors such as Turtle & Hughes, Inc., 2321 Whitney Ave., Ste. 501, Hamden, Connecticut; authorized Legrand providers such as Electrical Connection, Inc., 65 Louis Street, Unit D, Newington, Connecticut; authorized dealers such as QMotion dealer HomeTronics Lifestyles, LLC, 57 Ozick Drive Unit I, Durham, Connecticut; and lighting showrooms such as Connecticut Lighting Centers.

15.     Defendants conduct substantial business in this District, directly and through intermediaries, including (i) at least a portion of the infringements alleged herein, (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from goods and services provided to individuals in this District, and (iii) using the Legrand webpages, authorized providers, and other means to induce individuals in this District to commit acts of infringement.

## **BACKGROUND**

16.     Established in 1961, Lutron is the lighting control industry pioneer, manufacturing and/or supplying more than 15,000 products to address the lighting control requirements of virtually any residential or commercial project.  Lutron's success is the result of its long history of innovation, beginning with its founder's successful commercialization of the solid-state dimmer switch used to dim lamps (a generic term for light bulbs of many varieties). After more than fifty years, Lutron remains a leading innovator and the world's industry leader in controlling natural and artificial light. Lutron is also a leader in efforts to reduce electrical consumption.  Lutron lighting controls have reduced electrical use by an estimated 9.2 billion

kWH, which equates to a collective reduction in its customers' electric bills by approximately $1 billion annually.

17.    Lutron's history of innovation, quality, and success has been widely recognized. For example, an April 29, 2010, notable products, objects, and papers from Lutron's 50-year history were added to the Electricity Collection of the Smithsonian's National Museum of American History, joining other notable artifacts such as Thomas Edison's experimental light bulbs.  Lutron's products are also utilized in some of the most renowned locations in the world. For example, Lutron's lighting control systems are utilized in such locations as the White House, the Guggenheim Museum, the Metropolitan Museum of Art, the Bank of China headquarters, and Windsor Castle.

18.    Lutron introduced the world's first commercially viable solid-state electronic lighting control device used to dim electric lamps.  This device, often referred to as a "dimmer switch," replaced bulky rheostats and autotransformers that were inefficient and unattractive. Lutron remains a leading innovator and manufacturer of dimmer switches and other lighting control devices worldwide.

19.    The evolution and increasing diversity of lamps more recently has called for greater sophistication in dimmer switches, and Lutron has continued to lead the way. For example, Lutron engineers developed an automated mechanism within the dimmer switch itself to sense an electrical characteristic related to the lamp and optimize the dimming protocol accordingly. This allows for a single dimmer switch to operate more effectively across a wider range of lamp characteristics and types. Lutron has also led the way in highly complex and massive wireless networks of lighting controls and many other technologies. This case focuses on some of Lutron's innovations with the ubiquitous dimmer switch itself, as well as remote controls and systems.

20.     United States Patent No. 8,242,714 is entitled, "Two-Wire Dimmer Circuit for a Screw-In Compact Fluorescent Lamp" and dated August 14, 2012. The named inventors of the '714 patent are Russell Weightman and Mark Taipale, both Lutron engineers. Lutron is the exclusive owner of the '714 patent, including the sole right to prosecute this action and enforce the patent against infringers, and to collect damages for all relevant times.

21.     United States Patent No. 8,704,459 is entitled, "Two-Wire Dimmer Circuit for a Screw-In Compact Fluorescent Lamp" and dated April 22, 2014. The named inventors of the '459 patent are Russell Weightman and Mark Taipale, both Lutron engineers. Lutron is the exclusive owner of the '459 patent, including the sole right to prosecute this action and enforce the patent against infringers, and to collect damages for all relevant times.

22.     United States Patent No. 6,803,728 is entitled, "System for Control of Devices" and dated October 12, 2004. The named inventors, minus the names that were requested to be deleted during prosecution, are Richard Leo Black, Brian Michael Courtney, Stuart William Dejonge, William Harlan Howe, Donald Ray Mosebrook, Chris Mark Rogan, Siddarth Sinha, Steven Spencer Thompson, and Robert Francis Walko, Jr., all current or former Lutron engineers. Lutron is the exclusive owner of the '728 patent, including the sole right to prosecute this action and enforce the patent against infringers, and to collect damages for all relevant times.

23.     United States Patent No. 7,663,325 is entitled, "Programmable Wallbox Dimmer" and dated February 16, 2010. The named inventors are Bridget McDonough, Walter Zaharchuk, and Edward Blair, all Lutron engineers. Lutron is the exclusive owner of the '325 patent, including the sole right to prosecute this action and enforce the patent against infringers, and to collect damages for all relevant times.

24.     United States Patent No. 9,024,800 is entitled, "Wireless Battery-Powered Remote Control Having Multiple Mounting Means" and dated May 5, 2015. The named inventors are Gregory Altonen, Edward Felegy, Jr., Elliot Jacoby, Jr., and Gregory Snyder, all current or former Lutron engineers. Lutron is the exclusive owner of the '800 patent, including the sole right to prosecute this action and enforce the patent against infringers, and to collect damages for all relevant times.

25.     United States Patent No. 9,361,790 is entitled, "Remote Control for a Wireless Load Control System" and dated June 7, 2016. The named inventors are Gregory Altonen, Edward Felegy, Jr., Elliot Jacoby, Jr., and Gregory Snyder, all current or former Lutron engineers. Lutron is the exclusive owner of the '790 patent, including the sole right to prosecute this action and enforce the patent against infringers, and to collect damages for all relevant times.

## THE LEGRAND INFRINGING PRODUCTS

### '714 Accused Instrumentalities

26.     LEGRAND manufactures, imports, uses, and sells multiple dimmers that infringe Lutron's '714 patent, including at least claim 25. These dimmers include at least the adorne ADTP703TU and ADTP703H lines, the Radiant RH703PTU line, and the Harmony H703PTU line (collectively, the "Accused '714 Dimmers").

27.     The Accused '714 Dimmers are adapted to be coupled between an AC power source at a first terminal and a lighting load at a second terminal for controlling the intensity of the lighting load within a dynamic range comprising a high-end intensity setting and a low-end intensity setting.

28.     The Accused '714 Dimmers include a controllably conductive switching device adapted to be coupled in series electrical connection between the first and second terminals for controlling the amount of power delivered to the lighting load.

29.     The Accused '714 Dimmers include a controller coupled to a control input of the controllably conductive switching device for controlling the controllably conductive switching device to be conductive for a conduction interval each half cycle of the AC power source.

30.     The Accused '714 Dimmers also include a sensing circuit coupled such that the sensing circuit is operable to sense an electrical characteristic of the second terminal, such as a current or a voltage, and adapted to provide a control signal representative of the electrical characteristic to the controller.

31.     The controller in the Accused '714 Dimmers is operable to automatically adjust the low-end intensity setting to one of a first low-end intensity setting value and a second low-end intensity setting value in response to the control signal from the sensing circuit.

**'459 Accused Instrumentalities**

32.     LEGRAND manufactures, imports, uses, and sells multiple dimmers that infringe Lutron's '459 patent, including at least claim 17. These dimmers include at least the adorne ADTP703TU and ADTP703H lines, the Radiant RH703PTU line, and the Harmony H703PTU line (collectively, the "Accused '459 Dimmers").

33.     The Accused '459 Dimmers are adapted to be coupled between an AC power source and a lighting load to control the intensity of the lighting load between a high-end intensity setting and a low-end intensity setting.

34.     The Accused '459 Dimmers include a controllably conductive switching device adapted to be coupled in series electrical connection between the AC line voltage and the lighting

load for controlling the amount of power delivered to the lighting load, wherein the controllably conductive switching device is conductive in a half cycle of the AC line voltage after an AC line voltage zero crossing.

35.     The Accused '459 Dimmers automatically determine if the controllably conductive switching device is conducting a load current to the lighting load at a predetermined time after the controllably conductive switching device is rendered conductive during the AC line voltage half cycle.

36.     The Accused '459 Dimmers automatically adjust the low-end intensity setting, in response to automatically determining if the controllably conductive switching device is conducting the load current, from a first low-end intensity setting value to a second low-end intensity setting value, thereby setting a dimming range of the dimmer switch depending on whether the controllably conductive switching device is conducting load current to the lighting load.

**'728 Accused Instrumentalities**

37.     LEGRAND manufactures, imports, uses, and sells systems that infringe Lutron's '728 patent, including at least claims 1 and 21. These systems include at least a system including a QMotion remote like the Zigbee Multi Channel Remote, the QMotion Range Extender, and a controlled device such as Zigbee HA1.2 shades (collectively, the "Accused '728 Systems").

38.     The Accused '728 Systems comprise a control system for controlling at least natural lighting, a remote control with buttons operable by a user to initiate events by the controlled device, a central processor, and a device such as shades controlled by the remote control.

39.     The remote control and shades in the Accused '728 Systems include parts of a system database.

40.    The part of the system database within the remote control maps a user's operation of a button to a first command able to be transmitted from the remote.

41.    The remote is arranged to transmit sufficient information to a central processor such as the Range Extender to identify the button operation that validly commands the system.

42.    In the Accused '728 Systems, the central processor such as the Range Extender is arranged to transmit a second command to the controlled device.

43.    The database within the controlled device such as the shades maps the second command to a device action.

44.    The first and second commands referenced above contain less data than is necessary to describe completely the action of the controlled device.

**'325 Accused Instrumentalities**

45.    LEGRAND manufactures, imports, and sells multiple dimmers that infringe Lutron's '325 patent, including at least claim 5. These dimmers include at least the adorne ADWR700RMTU, ADTP700RMTU, and ADTH700RMTU lines and the Radiant LC2101 line (collectively, the "Accused '325 Dimmers").

46.    The Accused '325 Dimmers are wallbox dimmers for controlling the light intensity level of a lamp, and have a normal operational mode and a programming mode.

47.    The Accused '325 Dimmers include an intensity level display operatively coupled to a microcontroller.

48.    In the normal operational mode of the Accused '325 Dimmers, the microcontroller causes the intensity level display to provide a user-perceptible indication representative of a current intensity level of the lamp.

49.     In the programming mode of the Accused '325 Dimmers, the microcontroller enables a user to program any of a plurality of programmable features provided by the dimmer and causes the intensity level display to provide a user-perceptible indication representative of a programmable feature value associated with one of said plurality of programmable features.

**'800 Accused Instrumentalities**

50.     LEGRAND manufactures, imports, uses, and sells systems that infringe Lutron's '800 patent, including at least claim 13. These systems include at least the QMotion remotes for blinds and drapes, such as the Gen 3 Single Channel Remote, QdR Gen 3 Multi Channel Remote, ZigBee Multi Channel Remote, and the QMotion Drapery Remote (collectively, the "Accused '800 Remotes").

51.     The Accused '800 Remotes are remote controls for a wireless load control system such as control of blinds and drapes.

52.     The Accused '800 Remotes include a housing with a front surface and a rectangular outer periphery. The length and width of the housing's outer periphery are slightly smaller than the length and width of a standard Decora opening, a designer-style opening with length and width set by a standard published by the National Electrical Manufacturers Association, on the front surface of a faceplate.

53.      There is at least one button provided at the front surface of the housing.

54.     There is a wireless transmitter within the housing.

55.     Also within the housing of the Accused '800 Remotes is a controller that is coupled to the wireless transmitter to cause a wireless signal to be transmitted in response to a button press.

56.     The wireless transmitter and the controller are adapted to be powered by a battery contained within the housing.

11

57.     The Accused '800 Remotes are configured so that, when the housing and the faceplate are mounted to a wall, the outer periphery of the housing is received within the standard opening on the front surface of the faceplate and the full front surface of the housing is exposed through the opening in the faceplate.

58.     The Accused '800 Remotes are configured to function both when held in a user's hand and when mounted to a vertical surface and received in the standard opening.

59.     In this way, when mounted the Accused '800 Remotes appear to the user to function like a wallbox-mounted load control device.

**'790 Accused Instrumentalities**

60.     LEGRAND manufactures, imports, uses, and sells systems that infringe Lutron's '790 patent, including at least claim 23. These systems include at least the QMotion remotes for blinds and drapes, such as the Gen 3 Single Channel Remote, QdR Gen 3 Multi Channel Remote, ZigBee Multi Channel Remote, and the QMotion Drapery Remote (collectively, the "Accused '790 Systems").

61.     The Accused '790 Remotes are remote controls for a RF load control system configured to control electrical loads such as motors for blinds and drapes.

62.     The Accused '790 Remotes include a housing with a front surface and a rectangular outer periphery. The length and width of the housing's outer periphery are slightly smaller than the length and width of a standard Decora opening, a designer-style opening with length and width set by a standard published by the National Electrical Manufacturers Association, on the front surface of a faceplate.

63.     There is at least one button provided at the front surface of the housing configured to be pressed by a user.

64.     There is an RF transmitter within the housing configured to transmit RF signals.

65.     Also within the housing of the Accused '790 Remotes is a controller that is coupled to the RF transmitter to cause an RF signal to be transmitted in response to a button press.

66.     The wireless transmitter and the controller are adapted to be powered by a battery contained within the housing.

67.     The Accused '790 Remotes are configured so that, when the housing and the faceplate are mounted on a wall, the outer periphery of the housing is received within the standard opening on the front surface of the faceplate and the full front surface of the housing is exposed through the opening in the faceplate.

68.     The housing of the Accused '790 Remotes is configured to be unmounted from the wall and removed from the opening of the faceplate.

69.     The Accused '790 Remotes are configured to function both when mounted to a wall and received in the standard opening and when the housing is unmounted from the wall.

## COUNT 1

## INFRINGEMENT OF U.S. PATENT 8,242,714

70.     Lutron incorporates by reference paragraphs 1-69 and re-alleges them as if stated here.

71.     LEGRAND infringes the '714 patent both directly and indirectly, either literally or under the doctrine of equivalents.

72.     LEGRAND manufactures Accused '714 Dimmers in the United States.

73.     LEGRAND uses Accused '714 Dimmers in the United States.

74.     LEGRAND imports Accused '714 Dimmers into the United States.

75.     LEGRAND offers Accused '714 Dimmers for sale in the United States.

76.     LEGRAND sells Accused '714 Dimmers in the United States.

77.     LEGRAND's making, using, offering to sell, and selling Accused '714 Dimmers in the United States, and its importing Accused '714 Dimmers into the United States, each constitutes direct infringement.

78.     Through at least the interactive websites at www.legrand.com and www.legrand.us, installation and user guides, and training, LEGRAND has induced others, such as distributors and end users, to sell and use the Accused '714 Dimmers and otherwise to directly infringe the '714 patent.

79.     As a competitor that Lutron has previously sued for patent infringement, LEGRAND is well aware of Lutron's portfolio of active patents.

80.     LEGRAND has had specific knowledge of the '714 patent since no later than the date of filing of this Complaint.

81.     Moreover, in light of LEGRAND's history with Lutron's patents, to the extent LEGRAND claims no specific knowledge of the '714 patent prior to the filing of the Complaint, on information and belief LEGRAND has made itself willfully blind to Lutron's patent rights.

82.     LEGRAND actively induced the conduct constituting direct infringement with knowledge of the '714 patent and with knowledge that the conduct would constitute infringement. LEGRAND's active inducement constitutes indirect infringement and is ongoing.

83.     LEGRAND's actions are at least objectively reckless as to the risk of infringing a valid Lutron patent, and this objective risk was either known or should have been known by LEGRAND.

84.     LEGRAND has also indirectly infringed by contributing to the infringement of the '714 patent. This constitutes indirect infringement that is ongoing.

14

85.     LEGRAND has imported and sold Accused '714 Dimmers with special features that are specially designed to be used in an infringing manner and that have no substantial uses other than uses that infringe. The special features include at least the Initial Turn-on feature that performs an automated min level trim sequence after power is applied.

86.     LEGRAND's direct and indirect infringement of the '714 patent is, has been, and continues to be willful, intentional, deliberate, and in conscious disregard of Lutron's patent rights.

87.     Lutron has been damaged as a result of Defendants' infringing conduct alleged above. Thus, Defendants are liable to Lutron in an amount that adequately compensates it for such infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 2

## INFRINGEMENT OF U.S. PATENT 8,704,459

88.     Lutron incorporates by reference paragraphs 1-69 and re-alleges them as if stated here.

89.     LEGRAND infringes the '459 patent both directly and indirectly, either literally or under the doctrine of equivalents.

90.     LEGRAND manufactures Accused '459 Dimmers in the United States.

91.     LEGRAND uses Accused '459 Dimmers in the United States.

92.     LEGRAND imports Accused '459 Dimmers into the United States.

93.     LEGRAND offers Accused '459 Dimmers for sale in the United States.

94.     LEGRAND sells Accused '459 Dimmers in the United States.

95.     LEGRAND's making, using, offering to sell, and selling Accused '459 Dimmers in the United States, and its importing Accused '459 Dimmers into the United States, each constitutes direct infringement.

96.     Through at least the interactive websites at www.legrand.com and www.legrand.us, installation and user guides, and training, LEGRAND has induced others, such as distributors and end users, to sell and use the Accused '459 Dimmers and otherwise to directly infringe the '459 patent.

97.     As a competitor that Lutron has previously sued for patent infringement, LEGRAND is well aware of Lutron's portfolio of active patents.

98.     LEGRAND has had specific knowledge of the '459 patent since no later than the date of filing of this Complaint.

99.     Moreover, in light of LEGRAND's history with Lutron's patents, to the extent LEGRAND claims no specific knowledge of the '459 patent prior to the filing of the Complaint, on information and belief LEGRAND has made itself willfully blind to Lutron's patent rights.

100.    LEGRAND actively induced the conduct constituting direct infringement with knowledge of the '459 patent and with knowledge that the conduct would constitute infringement. LEGRAND's active inducement constitutes indirect infringement and is ongoing.

101.    LEGRAND's actions are at least objectively reckless as to the risk of infringing a valid Lutron patent, and this objective risk was either known or should have been known by LEGRAND.

102.    LEGRAND has also indirectly infringed by contributing to the infringement of the '459 patent. This constitutes indirect infringement that is ongoing.

103.     LEGRAND has imported and sold Accused '459 Dimmers with special features that are specially designed to be used in an infringing manner and that have no substantial uses other than uses that infringe. The special features include at least the Initial Turn-on feature that performs an automated min level trim sequence after power is applied.

104.     LEGRAND's direct and indirect infringement of the '459 patent is, has been, and continues to be willful, intentional, deliberate, and in conscious disregard of Lutron's patent rights.

105.     Lutron has been damaged as a result of Defendants' infringing conduct alleged above. Thus, Defendants are liable to Lutron in an amount that adequately compensates it for such infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 3

## INFRINGEMENT OF U.S. PATENT 6,803,728

106.     Lutron incorporates by reference paragraphs 1-69 and re-alleges them as if stated here.

107.     LEGRAND infringes the '728 patent both directly and indirectly, either literally or under the doctrine of equivalents.

108.     LEGRAND manufactures Accused '728 Systems in the United States.

109.     LEGRAND uses Accused '728 Systems in the United States.

110.     LEGRAND imports Accused '728 Systems into the United States.

111.     LEGRAND offers Accused '728 Systems for sale in the United States.

112.     LEGRAND sells Accused '728 Systems in the United States.

113.    LEGRAND's making, using, offering to sell, and selling Accused '728 Systems in the United States, and its importing Accused '728 Systems into the United States, each constitutes direct infringement.

114.    Through at least the interactive websites at www.legrand.com, www.legrand.us, and www.qmotionshades.com, installation and user guides, and training, LEGRAND has induced others, such as distributors, dealers, and end users, to sell and use the Accused '728 Systems and otherwise to directly infringe the '728 patent.

115.    As a competitor that Lutron has previously sued for patent infringement, LEGRAND is well aware of Lutron's portfolio of active patents.

116.    LEGRAND has had specific knowledge of the '728 patent since no later than the date of filing of this Complaint.

117.    Moreover, in light of LEGRAND's history with Lutron's patents, to the extent LEGRAND claims no specific knowledge of the '728 patent prior to the filing of the Complaint, on information and belief LEGRAND has made itself willfully blind to Lutron's patent rights.

118.    LEGRAND actively induced the conduct constituting direct infringement with knowledge of the '728 patent and with knowledge that the conduct would constitute infringement. LEGRAND's active inducement constitutes indirect infringement and is ongoing.

119.    LEGRAND's actions are at least objectively reckless as to the risk of infringing a valid Lutron patent, and this objective risk was either known or should have been known by LEGRAND.

120.    LEGRAND has also indirectly infringed by contributing to the infringement of the '728 patent. This constitutes indirect infringement that is ongoing.

121.    LEGRAND has imported and sold Accused '728 Systems and components of such systems with special features that are specially designed to be used in an infringing manner and that have no substantial uses other than uses that infringe. The special features include at least the command protocol and database configuration used by the Accused '728 Systems and their components.

122.    LEGRAND's direct and indirect infringement of the '728 patent is, has been, and continues to be willful, intentional, deliberate, and in conscious disregard of Lutron's patent rights.

123.    Lutron has been damaged as a result of Defendants' infringing conduct alleged above. Thus, Defendants are liable to Lutron in an amount that adequately compensates it for such infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 4

## INFRINGEMENT OF U.S. PATENT 7,663,325

124.    Lutron incorporates by reference paragraphs 1-69 and re-alleges them as if stated here.

125.    LEGRAND infringes the '325 patent both directly and indirectly, either literally or under the doctrine of equivalents.

126.    LEGRAND manufactures Accused '325 Dimmers in the United States.

127.    LEGRAND uses Accused '325 Dimmers in the United States.

128.    LEGRAND imports Accused '325 Dimmers into the United States.

129.    LEGRAND offers Accused '325 Dimmers for sale in the United States.

130.    LEGRAND sells Accused '325 Dimmers in the United States.

131.     LEGRAND's making, using, offering to sell, and selling Accused '325 Dimmers in the United States, and its importing Accused '325 Dimmers into the United States, each constitutes direct infringement.

132.     Through at least the interactive websites at www.legrand.com and www.legrand.us, installation and user guides, and training, LEGRAND has induced others, such as distributors and end users, to sell and use the Accused '325 Dimmers and otherwise to directly infringe the '325 patent.

133.     As a competitor that Lutron has previously sued for patent infringement, LEGRAND is well aware of Lutron's portfolio of active patents.

134.     LEGRAND has had specific knowledge of the '325 patent since no later than the date of filing of this Complaint.

135.     Moreover, in light of LEGRAND's history with Lutron's patents, to the extent LEGRAND claims no specific knowledge of the '325 patent prior to the filing of the Complaint, on information and belief LEGRAND has made itself willfully blind to Lutron's patent rights.

136.     LEGRAND actively induced the conduct constituting direct infringement with knowledge of the '325 patent and with knowledge that the conduct would constitute infringement. LEGRAND's active inducement constitutes indirect infringement and is ongoing.

137.     LEGRAND's actions are at least objectively reckless as to the risk of infringing a valid Lutron patent, and this objective risk was either known or should have been known by LEGRAND.

138.     LEGRAND has also indirectly infringed by contributing to the infringement of the '325 patent. This constitutes indirect infringement that is ongoing.

139.    LEGRAND has imported and sold Accused '325 Dimmers with special features that are specially designed to be used in an infringing manner and that have no substantial uses other than uses that infringe. The special features include at least independent control of individual intensity level LEDs to indicate information in addition to intensity level.

140.    LEGRAND's direct and indirect infringement of the '325 patent is, has been, and continues to be willful, intentional, deliberate, and in conscious disregard of Lutron's patent rights.

141.    Lutron has been damaged as a result of Defendants' infringing conduct alleged above. Thus, Defendants are liable to Lutron in an amount that adequately compensates it for such infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

<u>**COUNT 5**</u>

<u>**INFRINGEMENT OF U.S. PATENT 9,024,800**</u>

142.    Lutron incorporates by reference paragraphs 1-69 and re-alleges them as if stated here.

143.    LEGRAND infringes the '800 patent both directly and indirectly, either literally or under the doctrine of equivalents.

144.    LEGRAND manufactures Accused '800 Remotes in the United States.

145.    LEGRAND uses Accused '800 Remotes in the United States.

146.    LEGRAND imports Accused '800 Remotes into the United States.

147.    LEGRAND offers Accused '800 Remotes for sale in the United States.

148.    LEGRAND sells Accused '800 Remotes in the United States.

149.    LEGRAND's making, using, offering to sell, and selling Accused '800 Remotes in the United States, and its importing Accused '800 Remotes into the United States, each constitutes direct infringement.

150.    Through at least the interactive websites at www.legrand.com, www.legrand.us, and www.qmotionshades.com, installation and user guides, and training, LEGRAND has induced others, such as distributors, dealers, and end users, to sell and use the Accused '800 Remotes and otherwise to directly infringe the '800 patent.

151.    As a competitor that Lutron has previously sued for patent infringement, LEGRAND is well aware of Lutron's portfolio of active patents.

152.    LEGRAND has had specific knowledge of the '800 patent since no later than the date of filing of this Complaint.

153.    Moreover, in light of LEGRAND's history with Lutron's patents, to the extent LEGRAND claims no specific knowledge of the '800 patent prior to the filing of the Complaint, on information and belief LEGRAND has made itself willfully blind to Lutron's patent rights.

154.    LEGRAND actively induced the conduct constituting direct infringement with knowledge of the '800 patent and with knowledge that the conduct would constitute infringement. LEGRAND's active inducement constitutes indirect infringement and is ongoing.

155.    LEGRAND's actions are at least objectively reckless as to the risk of infringing a valid Lutron patent, and this objective risk was either known or should have been known by LEGRAND.

156.    LEGRAND has also indirectly infringed by contributing to the infringement of the '800 patent. This constitutes indirect infringement that is ongoing.

157.    LEGRAND has imported and sold Accused '800 Remotes and faceplates, which are specially designed to be used in an infringing manner and have no substantial uses other than uses that infringe.

158.    LEGRAND's direct and indirect infringement of the '800 patent is, has been, and continues to be willful, intentional, deliberate, and in conscious disregard of Lutron's patent rights.

159.    Lutron has been damaged as a result of Defendants' infringing conduct alleged above. Thus, Defendants are liable to Lutron in an amount that adequately compensates it for such infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 6

## INFRINGEMENT OF U.S. PATENT 9,361,790

160.    Lutron incorporates by reference paragraphs 1-69 and re-alleges them as if stated here.

161.    LEGRAND infringes the '790 patent both directly and indirectly, either literally or under the doctrine of equivalents.

162.    LEGRAND manufactures Accused '790 Remotes in the United States.

163.    LEGRAND uses Accused '790 Remotes in the United States.

164.    LEGRAND imports Accused '790 Remotes into the United States.

165.    LEGRAND offers Accused '790 Remotes for sale in the United States.

166.    LEGRAND sells Accused '790 Remotes in the United States.

167.    LEGRAND's making, offering to sell, and selling Accused '790 Remotes in the United States, and its importing Accused '790 Remotes into the United States, each constitutes direct infringement.

168.     Through at least the interactive websites at www.legrand.com, www.legrand.us, and www.qmotionshades.com, installation and user guides, and training, LEGRAND has induced others, such as distributors, dealers, and end users, to sell and use the Accused '790 Remotes and otherwise to directly infringe the '790 patent.

169.     As a competitor that Lutron has previously sued for patent infringement, LEGRAND is well aware of Lutron's portfolio of active patents.

170.     LEGRAND has had specific knowledge of the '790 patent since no later than the date of filing of this Complaint.

171.     Moreover, in light of LEGRAND's history with Lutron's patents, to the extent LEGRAND claims no specific knowledge of the '790 patent prior to the filing of the Complaint, on information and belief LEGRAND has made itself willfully blind to Lutron's patent rights.

172.     LEGRAND actively induced the conduct constituting direct infringement with knowledge of the '790 patent and with knowledge that the conduct would constitute infringement. LEGRAND's active inducement constitutes indirect infringement and is ongoing.

173.     LEGRAND's actions are at least objectively reckless as to the risk of infringing a valid Lutron patent, and this objective risk was either known or should have been known by LEGRAND.

174.     LEGRAND has also indirectly infringed by contributing to the infringement of the '790 patent. This constitutes indirect infringement that is ongoing.

175.     LEGRAND has imported and sold Accused '790 Remotes and faceplates, which are specially designed to be used in an infringing manner and have no substantial uses other than uses that infringe.

176.    LEGRAND's direct and indirect infringement of the '790 patent is, has been, and continues to be willful, intentional, deliberate, and in conscious disregard of Lutron's patent rights.

177.    Lutron has been damaged as a result of Defendants' infringing conduct alleged above. Thus, Defendants are liable to Lutron in an amount that adequately compensates it for such infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## JURY DEMAND

Lutron hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

Lutron requests that the Court find in its favor and against Defendants, and that the Court grant Lutron the following relief:

a.  That each Defendant be summoned to appear and answer;

b.  Judgment in favor of Lutron that the Defendants have infringed each of the Asserted Patents and that their infringement has been willful;

c.  A permanent injunction entered against Defendants to prevent any further infringement of the Asserted Patents;

d.  An order adjudging that this is an exceptional case under 35 U.S.C. § 285;

e.  Judgment against Defendants for all actual, consequential, special, punitive, exemplary, increased, and/or statutory damages, including if necessary an accounting of all damages, pre- and post-judgment interest as allowed by law, and reasonable attorneys' fees, costs, and expenses incurred in this action; and

f.  Such other and further relief to Lutron as the Court may deem just and proper under the circumstances.

Dated: August 21, 2017    Respectfully submitted,

          */s/ Craig A. Raabe*
          Craig A. Raabe (ct04116)
          Douglas P. Needham (ct29433)
          **Izard, Kindall & Raabe, LLP**
          29 South Main Street, Suite 305
          West Hartford, CT 06107
          Tel: (860) 493-6292
          Fax: (860) 493-6290
          craabe@ikrlaw.com
          dneedham@ikrlaw.com

          Scott W. Breedlove
          Texas State Bar No. 00790361
          Pro hac vice application forthcoming
          sbreedlove@carterscholer.com
          E. Leon Carter
          Texas State Bar No. 03914300
          Pro hac vice application forthcoming
          lcarter@carterscholer.com
          Janet Landry Smith
          Texas State Bar No. 24089755
          Pro hac vice application forthcoming
          jsmith@carterscholer.com
          **CARTER SCHOLER, PLLC**
          8150 N. Central Expressway, Fifth Floor
          Dallas, Texas 75206
          Telephone No. (214) 550-8188
          Facsimile No. (214) 550-8185

          James D. Herschlein
          NY State Bar No. 2036622
          Pro hac vice application forthcoming
          James.Herschlein@apks.com
          **ARNOLD & PORTER KAYE SCHOLER LLP**
          250 West 55th Street
          New York, New York 10019-9710
          Telephone No. (212) 836-8655
          Facsimile No. (212) 836-6455

          **ATTORNEYS FOR PLAINTIFF**
          **LUTRON ELECTRONICS CO., INC.**